Menachem PRI–HAR, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 93 CR. 278(JES).
No. 96 Civ. 9577(JES).

United States District Court,
S.D. New York.

Feb. 9, 2000.

Law Offices of Neil Hurwitz, New York City (Neil Hurwitz, of counsel), Doar, Devorkin & Rieck, New York City (Walter Mack, of counsel), for petitioner.

Mary Jo White, United States Attorney, New York City, John T. McCormick, Assistant United States Attorney, of counsel, Mark Stein, Special Assistant United States Attorney, for U.S.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33") and 28 U.S.C. § 2255 (" § 2255"), petitioner moves to vacate his conviction or, alternatively, for an order granting a new trial based upon newly-discovered evidence, prosecutorial misconduct, and ineffective assistance of counsel. In addition, pursuant to 28 U.S.C. §§ 144, 455(a) and 455(b)(1), petitioner moves for this Court to recuse itself from determination of his § 2255 motion on the grounds that this Court has a personal prejudice against him or, absent actual bias, has created a strong appearance of prejudice. For the reasons stated below, petitioner's motions are denied.

## BACKGROUND

On October 26, 1993, petitioner, Menachem Pri-har ("Pri-har"), was indicted on twenty-four counts charging him with fraudulently obtaining more than $84 million in loans and U.S. government subsidies by submitting false documents and statements to the U.S. Department of Agriculture ("USDA") and to numerous domestic and foreign banks. Pri-har pled not guilty to all charges of the indictment. A jury trial began on November 9, 1993, and proceeded for two months.

At trial, the government presented evidence that established that Pri-har operated and controlled Red Rock Commodities, Ltd. ("RRC"), a commodities trading firm headquartered in New York City. Through RRC, Pri-har was able to obtain financing for a number of elaborate commodity trading schemes. First, by falsely naming an RRC affiliate, Olges, Ltd. ("Olges"), as a buyer of barley from RRC at excessively high prices, Pri-har obtained approximately $4 million in subsidies from the USDA. Second, by submitting false financial statements and overstating the price RRC paid for its wheat, Pri-har secured approximately $35 million in loans to finance RRC's contract to supply wheat for the Israeli Emergency Wheat Program ("IEWP"). Third, by wiring numerous fabricated invoices and forwarding misleading RRC bank statements, Pri-har obtained financing from Dresdner Bank in Germany in order to assert control over the IEWP. Fourth, by misrepresenting RRC's financial condition and purporting to use the loans for margin purchases of steel and grain futures contracts, Pri-har acquired and maintained a $1.5 million credit line from Banque Nationale de Paris, New York branch ("BNP–New York"). Fifth, by submitting false RRC financial statements and misrepresenting the status of the loan collateral, Pri-har acquired from BNP–New York and ABN–AMRO Bank approximately $17 million in loans to finance the shipment of steel from Poland to Israel. Finally, by falsely claiming own-

ership of two New York properties on his personal financial statements, Pri-har obtained a $1 million loan from Citibank and a $17 million loan from the Bank of Tokyo to finance the short-term borrowing needs and various real estate transactions of RRC's parent company, Red Rock Holding, Ltd. ("RRH").

The government directly implicated Pri-har in the various commodities schemes with testimony from employees of the USDA, the defrauded banks, and RRC. The government also presented physical evidence implicating Pri-har, including incriminating contracts, memoranda, correspondence, and tape recordings seized from Pri-har's home and business offices. In his defense, Pri-har called two witnesses—his business manager and his secretary—and also testified on his own behalf.

On January 10, 1994, a jury found Pri-har guilty on all twenty-four counts of the indictment. After two unsuccessful post-trial motions, one for a new trial and the other for a judgment of acquittal, this Court sentenced Pri-har to 168 months of incarceration and five years of supervised release. This Court also ordered him to pay $39 million in restitution, in addition to a $1 million fine and the mandatory assessments. The Second Circuit affirmed the conviction and sentence on January 3, 1995. *See United States v. Pri-Har,* 47 F.3d 1157 (2d Cir.1995) (table opinion), *cert. denied,* 514 U.S. 1052, 115 S.Ct. 1431, 131 L.Ed.2d 312 (1995), *and reh'g denied,* 515 U.S. 1138, 115 S.Ct. 2571, 132 L.Ed.2d 822 (1995).

Pri-har filed the instant petition *pro se* on December 10, 1996, and a supplemental petition ("Sup.Pet.") on March 10, 1997. In these petitions, Pri-har claims that his conviction and sentence should be vacated because inconsistencies in the testimonies of various government witnesses constitute newly-discovered evidence. He argues that this newly-discovered evidence establishes his innocence and supports his allegations that the government suborned perjury, withheld exculpatory evidence, and misled the jury at trial. As additional grounds for relief, Pri-har propounds the failure of counsel to call expert witnesses, offer proper summation, and meet with an inquisitive juror.

In reply, the government primarily offers two contentions. First, the government charges that Pri-har's claims of prosecutorial misconduct and newly-discovered evidence are baseless and, in any event, fail to meet the heavy burden required for habeas relief under Rule 33 and § 2255. Second, the government argues that Pri-har's allegations of ineffective counsel are procedurally barred and without merit.

On November 13, 1998, Pri-har filed a motion requesting that this Court recuse itself from determination of his petition. In his recusal motion, Pri-har contends that comments made by this Court during oral argument of his § 2255 petition evidence a personal antagonism toward him that could threaten this Court's objectivity. Furthermore, Pri-har argues that, even absent actual bias against him, recusal is required because of the strong appearance of prejudice created by this Court's comments, Pri-har's nationality, and this Court's recusal in an unrelated criminal case based on its prior representation of the Libyan government.[1]

The government responds that recusal is not warranted because the Court's comments do not demonstrate any actual personal prejudice or bias and certainly fail to create an objective appearance of partiality. The government also contends that the inferences Pri-har draws from this

---

1. Petitioner cites "U.S. Asks British to Deliver Suspected Bin Laden Aide," an article in *The New York Times,* on September 29, 1998, which points out that this Court represented the Libyan government while in private practice with the firm of Curtis, Mallet–Prevost, Colt & Mosle from 1970 to 1981. The article also notes that this Court recused itself in a criminal case involving an alleged aide of Osama Bin Laden, the Saudi exile and alleged terrorist, because of its prior contact with the Libyan government.

Court's prior relationship with the Libyan government are unsubstantiated and speculative. Finally, the government reasons that this Court's decision to recuse itself in an unrelated action has no bearing on the instant motion because it was not based on personal prejudice or bias against a party because of that party's nationality or race.

## DISCUSSION

### I. *The Recusal Motion*

Pri-har moves this Court, pursuant to 28 U.S.C. § 144 and § 455(b)(1), to recuse itself from deciding the instant petition because of comments made by the Court at oral argument that petitioner alleges demonstrate personal prejudice against petitioner. Petitioner also contends, in the alternative, that even if the Court determines that their is no personal prejudice against petitioner, the Court should still recuse itself pursuant to 28 U.S.C. § 455(a), because the facts create the impression, to a reasonable observer, of the existence of such prejudice. Since petitioner has failed to demonstrate either actual bias or prejudice, or the appearance of such bias, the Court denies his motion to recuse for the reasons set forth below.

▮▮▮ Under both 28 U.S.C. § 144 and § 455(b)(1), a judge shall recuse himself from a pending matter where a party sufficiently demonstrates that the judge has an actual "personal bias or prejudice" against a party. The source of the bias or prejudice must normally be based on extrajudicial conduct. *See Apple v. Jewish Hospital and Medical Center*, 829 F.2d 326, 333 (2d Cir.1987); *Curley v. St. John's University*, 7 F.Supp.2d 359, 362 (S.D.N.Y.1998). "Events occurring in the course of judicial proceedings generally do not constitute a basis for recusal unless they indicate that the judge has a deep-seated favoritism or antagonism that would make fair judgment impossible." *United States v. Conte*, 99 F.3d 60, 65 (2d Cir.1996) (internal citations omitted). Thus, "judicial remarks . . . that are critical or disapproving of, or even

hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994). Moreover, it is well-settled that a judge's adverse rulings and decisions against a party almost never are a valid basis for a party to seek disqualification based on bias or impartiality. *See id.* Finally, the Court notes that a judge should not grant a recusal motion lightly lest the court encourage litigants "to advance speculative and ethereal arguments for recusal and thus arrogate to themselves a veto power over the assignment of judges." *Thomas v. Trustees for Columbia University*, 30 F.Supp.2d 430, 431 (S.D.N.Y.1998).

Pri-har's motion alleges that observations made by the Court at oral argument evince a personal antagonism toward petitioner that render the Court incapable of objectively ruling on his petition. *See* Petitioner's Memorandum of Law in Support of Motion for Recusal dated November 13, 1998 ("Rec.Mem.") at 1. According to Pri-har, "the thrust of these comments was that Petitioner is overly aggressive, domineering, controlling, arrogant and excessively demanding." *Id.* at 2. Petitioner also cites the Court's characterization of the events immediately preceding the return of the jury's verdict as additional evidence that the Court has an intense personal dislike of him. Furthermore, petitioner argues that the Court appeared not to have considered several theories offered by petitioner's counsel at oral argument, and that the Court has a "muted concern for justice in Petitioner's case," *id.* at 7, as additional evidence of bias.

▮▮▮ The Court declines petitioner's invitation to recuse itself from the instant case for a number of reasons. First, the Court disagrees with petitioner's view that it cannot objectively decide his petition because of remarks made by the Court at oral argument. The remarks made by the Court at the oral argument were based upon the Court's observation of petitioner

during numerous pre-trial proceedings, a two-month trial, and several post-trial motions, and were directly relevant to the issues raised in Pri-har's petition. For example, petitioner cites the Court's comment that he was "very loquacious in rasing almost everything at trial," see Rec. Mem. at 2, and the Court's observation that Pri-har has a "forceful personality" as evidence of bias. To the contrary, the Court's observation was made in the context of petitioner's argument that the Court should grant him a new trial based on newly-discovered evidence. As the Court noted, given Pri-har's trial strategy of pursuing almost every available line of defense, his claims of newly-discovered evidence were unpersuasive. See Transcript of Oral Argument held on October 1, 1998 ("Arg.Tr.") at 6.

Second, the Court rejects Pri-har's complaint that the Court exhibited a "muted concern for justice" when it expressed its opinion that petitioner "had received a fair trial. He may have gotten the wrong result." Arg.Tr. at 54. This comment, and others cited by petitioner, provide no basis for the conclusion that the Court should recuse itself on the basis of bias or animosity. Rather, the comments merely reflect this Court's opinion that petitioner received a fair trial, but he did not receive the result that he wanted.

Finally, the Court notes that Pri-har filed his recusal motion only after it became clear from the oral argument (which petitioner attended because the Court afforded him, at the request of counsel, a benefit not normally afforded most petitioners, i.e. the opportunity to personally appear on a writ to hear argument) that the Court was not receptive to the theories of relief raised in his petition. The Court suspects that petitioner filed the motion in order to avoid the negative outcome that petitioner anticipated would result from the tenor of the argument. This, of course, is also no basis upon which the Court should recuse itself from deciding the merits of Pri-har's petition. Accord-

ingly, for all of the aforementioned reasons, the Court must conclude that Pri-har has failed to demonstrate that the Court should recuse itself on the basis of bias or partiality. Therefore, Pri-har's motion to recuse brought pursuant to 28 U.S.C. §§ 144 and 455(b)(1) is denied.

In the alternative, Pri-har seeks recusal pursuant to 28 U.S.C. § 455(a) because "the Court's impartiality might reasonably be questioned." Rec.Mem. at 8. According to Pri-har, a reasonable observer familiar with Court's comments at oral argument would conclude that the Court has a strong personal dislike of petitioner sufficient to require recusal. In addition, Pri-har asserts that the Court should recuse itself because an observer could "reasonably infer that the Court's obvious dislike of Petitioner is fueled by the Petitioner's nationality." Id. at 10. This claim rests on a series of dubious assumptions that gravitate around the Court's recusal based on a potential conflict in another case because while in private practice the Court represented the Libyan government. From this fact Pri-har argues that since there is enmity between Libya and Israel, the Court should recuse itself in the instant case because petitioner is an Israeli citizen and "an objective observer ... might have good reason to believe that the Court harbored a bias against petitioner." Id. Pri-har also contends that recusal is warranted because "the characteristics which the Court has attributed to Petitioner—aggressiveness, arrogance, manipulativeness vis-a-vis banks—often are those attributed to the negative stereotype of Israelis." Id.

Given the dubious and speculative nature of the assumptions noted above, the Court is constrained to conclude that there is no basis for recusal on any of those grounds. Accordingly, petitioner's motion for recusal is denied.

## II. *The Merits*

### A. *Petitioner's Claims of Newly Discovered Evidence & Prosecutorial Misconduct*

Pri-har brings the instant petition pursuant to § 2255 and Rule 33 seek-

ing to vacate his conviction, or in the alternative, for a new trial, based on new evidence and prosecutorial misconduct.[2] In order to obtain such relief based upon newly-discovered evidence, petitioner bears a heavy burden of convincing the court that the newly-discovered evidence would have resulted in an acquittal. *See Romero v. United States,* 28 F.3d 267, 268 (2d Cir.1994) (per curiam); *United States v. Spencer,* 4 F.3d 115, 119 (2d Cir.1993). Such motions "based upon previously-undiscovered evidence [are] ordinarily not favored and should be granted only with great caution." *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (internal citations omitted). Moreover, for a petitioner to succeed on a habeas petition brought pursuant to § 2255 or a motion pursuant to Rule 33 based upon newly-discovered evidence, he must demonstrate that the evidence could not have been discovered, exercising due diligence, and that "the evidence is so material and non-cumulative that its admission would probably lead to an acquittal." *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992) (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)) (internal citations omitted).

Likewise, in order to obtain a new trial based on an allegation that the government suppressed exculpatory evidence,[3] *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *accord Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (extending *Brady* to impeachment material), the petitioner must establish that the government withheld evidence that is material such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, ——, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). However, the government is under no obligation to disclose exculpatory evidence "if the defendant knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982). Tested by these precepts, it is clear that virtually all of Pri-har's claims of new evidence must be rejected because they are not based on newly-discovered evidence. Similarly, petitioner's allegations that the government failed to disclose exculpatory evidence are untenable because petitioner invariably possessed enough information to make such disclosure by the government unnecessary.[4]

*"Wheat Loan" Counts*

As noted above, Pri-har asserts that his conviction for fraudulently overstating the price of wheat that he purchased under the IEWP should be overturned because of newly-discovered evidence, the government's failure to disclose a witness whose testimony supported petitioner's theory of

---

**2.** On August 17, 1999, petitioner submitted with the *Pro Se* Office of this Court a document entitled "Motion for Expansion of the Record." Petitioner may not pick and choose whether he is proceeding *pro se* or through counsel. Since the Court has had no indication that petitioner's counsel has withdrawn from representation, any motions that petitioner wishes to file should be filed by counsel. Accordingly, petitioner's motion is denied.

**3.** Where the petitioner claims that the newly-discovered evidence demonstrates that the government knowingly used false or perjured testimony, the petitioner must establish "that

(1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Helmsley,* 985 F.2d 1202, 1205–06 (2d Cir.1993) (internal citations omitted).

**4.** This Opinion highlights all of petitioner's main contentions. To the extent that petitioner asserts additional contentions, the Court finds them to be without merit and concludes that they do not warrant discussion in this Opinion.

the case in violation of *Brady*, and three post-conviction expert reports that support the conclusion that petitioner "was wrongly convicted and that a miscarriage of justice occurred." Reply Memorandum of Law in Support of Petition Pursuant to F.C.R.P. 33 and 28 U.S.C. § 2255 ("Rep. Mem.") at 2. Specifically, Pri-har argues that the post-trial civil testimony of two bankers at Standard Chartered Bank ("SCB"), Craig Tashjian and Sharon Delezenski, was inconsistent with testimony that they gave at petitioner's trial. *See* Affidavit in Support of Statement of Facts and Memorandum of Law for Petition Pursuant to F.R.C.P. 33 and 28 U.S.C. § 2255 ("Pet.") at 7–26. The alleged inconsistent testimony centers on whether Pri-har told the bankers that they would only be financing the purchase price of the wheat transactions, as the government contended at trial, or whether the banks agreed to finance the wheat according to a formula consistent with the petitioner's theory of the case. *See* Rep.Mem. at 3–6; Government's Memorandum of Law in Opposition ("Gov.Mem.") at 49–50. In addition, Pri-har argues that the government violated *Brady* by failing to disclose the existence of pre-trial deposition testimony of one of the bankers' supervisors, David Robie, that corroborated the petitioner's trial testimony regarding his interpretation of the financing agreement. *See* Rep.Mem. at 8–12.

The Court rejects petitioner's position that the bankers' testimony was inconsistent with the testimony that they gave at trial or that the government failed to establish his deceit when applying for the wheat loans. Petitioner's contention that Tashjian falsely testified at his trial that Pri-har submitted documents to the banks to the effect that they would only be fi-

nancing the purchase price of the wheat, *see* Rep.Mem. at 4–6, is based only upon a stipulation signed by the bank in subsequent civil litigation that it could find no "call reports or internal memoranda" regarding its negotiations with Pri-har. Gov.Mem. at 54–56. However, that stipulation is not inconsistent with Tashjian's trial testimony since Pri-har had in fact submitted numerous documents to the bank on behalf of his company while he attempted to secure the loans.[5] *See id.* Numerous witnesses also testified that Pri-har orally represented to the banks that they would only be financing the purchase price of the wheat. *See id.* at 50.[6]

■ The Court also rejects petitioner's contention that the government violated *Brady* by failing to disclose Robie's pre-trial interview. Robie had no involvement in the negotiations between the bank and RRC regarding the wheat loans, and in fact, only became involved with the petitioner after RRC had defaulted on the loans. *See id.* at 59–60. Therefore, Robie's testimony regarding his understanding of the parties' agreement, formulated after the fact, had no bearing on the parties' understanding regarding the financing terms of the wheat deal developed at numerous meetings that Robie did not participate in. Moreover, even if the Court were to conclude that Robie's testimony regarding his understanding of the financing contracts was material, Pri-har had several meetings with Robie regarding the loans at issue, and therefore certainly knew of his identity. Since petitioner knew Robie's identity before trial, and the substance of the discussions that he had with him at these meetings, the government was under no obligation to disclose it.

---

5. For example, one RRC memoranda, submitted to the financing banks, stated that the "financing of the *purchase* of the local crop in June 1992" will be required. *See* Gov.Mem. at 54 (emphasis added).

6. Petitioner also asserts that Isaac Fattal and Harry Dublinsky gave false testimony regarding the price structure of the wheat deal. *See* Pet. at 27–29. Petitioner's attack on Fattal and Dublinsky fails largely for the same reasons set forth with respect to Tashjian and Delezenski.

Similarly, the Court concludes that petitioner's post-trial expert reports are not newly-discovered evidence because petitioner has failed to demonstrate that the evidence could not have been discovered, through the exercise of reasonable diligence, before or during trial. Petitioner presents the Court with three expert reports that he obtained after the trial that petitioner asserts corroborate his version of the financing agreement between RRC and SCB. *See* Declaration of Walter Mack dated November 24, 1997 at Ex A–C. However, it was effectively conceded at oral argument that the reports, and the opinions and interpretations contained therein, were based upon documents available to the defense before and during the trial (and on direct appeal). *See* Arg.Tr. at 43–53. Expert reports such as the type presented to the Court here, based upon evidence available to the defense at trial, do not constitute new evidence. *See Massaro v. United States*, No. 97 Civ. 2971, 1998 WL 241625, at *2 (S.D.N.Y.1998) (holding that expert tests conducted by petitioner post-conviction, based upon evidence available to the defense at trial, did not constitute new evidence within the meaning of Rule 33). Accordingly, to the extent petitioner's motion for a new trial is based upon the so-called newly-discovered expert reports, that motion is denied.

### "Steel Loan" Counts

Petitioner next contends that he was wrongfully convicted of fraudulently obtaining two loans of approximately $17 million from BNP–New York and ABN–AMRO Bank in connection with the financing of steel shipments from Poland to Israel. *See* Pet.Mem. at 22–29. At trial, the government showed that Pri-har learned in early 1992 that the Israeli buyer of the steel, the Ram Steel Company, had moved the steel from customs without paying for it. *See* Gov.Mem. at 23–28, 70–71. Despite this knowledge, the government proved that Pri-har fraudulently represented to BNP and ABN–AMRO that he remained in control of the steel in order to obtain financing for the steel transactions. Pri-har contends, as he did at trial, that he did not become aware that the steel was no longer under his control until after he had sought financing from the banks, sometime in August 1992. In support of this, petitioner offers the post-trial civil testimony of Isaac Fattal, a government witness, and Yigal Shapira, a bank officer with Union Bank (the bank that held the bills of lading in trust for RRC), as new evidence of his innocence. Petitioner also argues that the government knew that Shapira would give testimony that supported his theory of the case, yet failed to disclose it in violation of *Brady*.

The Court is not persuaded by petitioner's argument that the post-trial testimony of Shapira or Fattal was inconsistent with the government's theory of the case: namely, that Pri-har was aware in early January or February of 1992 (perhaps even earlier) that he no longer controlled the steel, and that he subsequently represented to the banks that he controlled the steel in an effort to deceive them into providing additional financing. *See* Gov. Mem. at 71–78. Moreover, petitioner's allegations that the government violated *Brady* by failing to disclose Shapira's alleged exculpatory testimony is unpersuasive since petitioner certainly knew his identity and could have called him as a witness at trial.

### BNP Margin Loan Counts

Petitioner again argues that he is entitled to a new trial based upon newly-discovered evidence. At trial, the government showed that, as part of the larger steel and wheat loans between BNP and RRC, petitioner agreed to allocate $1.5 million to purchase futures contracts to hedge the underlying commodities shipments financed by BNP. *See* Gov.Mem. at 20–23. The government established, however, that instead of purchasing futures contracts for commodities financed by BNP, petitioner used the funds to pay for past margin expenses and operating costs.

Pri-har now claims that Barry Feigenbaum, a banker with BNP–New York, who testified at trial that Pri-har agreed to limit the $1.5 million to hedge against current and not past margin expenses, subsequently testified at a civil trial in a manner inconsistent with his testimony at petitioner's trial. *See* Pet. at 36–43, 59–60. Pri-har argues that Feigenbaum subsequently testified that he knew that the $1.5 million was to be used to pay for past margin expenses, and that he did not know who from RRC had told him that RRC had agreed to use the loans for current margin expenses.

Pri-har's argument that Feigenbaum's subsequent civil testimony was inconsistent with the testimony he gave at petitioner's trial lacks merit. Feigenbaum's full answer to the question regarding who from RRC had told him that the margin loans were to be used to meet current margin requirements was: "My testimony has been and is that *Pri-har* told us that is how the line would be used." Gov.Mem. at 82 (emphasis added). More importantly, Feigenbaum's testimony is not new evidence because his identity was known to petitioner at trial, and indeed was cross-examined at trial, so that his credibility, or lack thereof, was a question for the jury to decide.

*Financial Statement Counts*

Petitioner argues that he was wrongly convicted at trial for submitting false financial statements to several lenders during 1989 through 1991 in order to obtain loans to finance certain commodities transactions. *See* Pet. at 49–53; Rep.Mem. at 30–33. The government presented evidence at trial that Pri-har took out short-term, year-end loans from two banks, and misrepresented on RRC's financial statements that these loans, worth some $8.5 million, were cash assets of the company when, in fact, these loans were quickly repaid. *See* Gov.Mem. at 11–13, 84–88. In defense, petitioner argued that RRC had received the $8.5 million, and that the source of the funds was not from the short-term, year-end loans obtained from the banks. Petitioner now contends that the government failed to call Sheldon Ganz, RRC's accountant, and Neil Mandel, an employee of RRH, to testify at trial because they both would have corroborated his theory of the case. Specifically, petitioner asserts that he learned subsequent to his trial that the government interviewed Ganz and Mandel, and that they told the government that they did not believe that Pri-har had falsely inflated RRC's assets. *See* Rep.Mem. at 30–33. Moreover, petitioner contends that Ganz and Mandel, at a subsequent civil trial, testified that petitioner had loaned RRC funds from his personal wealth and from petitioner's real estate partnership. Finally, petitioner claims that the government compounded its failure to disclose the exculpatory nature of the witnesses' pre-trial interviews by commenting in its rebuttal summation that Ganz's testimony, if called to testify, would have supported the government's theory of the case, when in fact the opposite was true. *Id.*

Pri-har's claim that Mandel's and Ganz's post-trial civil testimony supported the testimony that he gave at trial fails because their testimony, rather than supporting Pri-har, actually contradicted the account given by Pri-har at his trial. Pri-har testified that the source of the $8.5 million asset listed on RRC's financial statements came from a loan from a business associate, Rafael Anzarouth. *See* Gov.Mem. at 86. In fact, Mandel testified after petitioner's trial that the $8.5 million listed on RRC's financial statement came from RRC's partnership account, not from Anzarouth. In addition, contrary to petitioner's contention that Ganz testified that Pri-har loaned RRC $8.5 million, Ganz later admitted during the same testimony that he could not identify the source of the $8.5 million listed on RRC's books. Thus, neither Ganz nor Mandel would have corroborated petitioner's defense at trial. Moreover, even assuming that this testimony would have aided in petitioner's defense

regarding the financial statement counts, the jury found, by special verdict, that petitioner made false statements to his lenders with regard to three other counts of the indictment. Since petitioner does not claim that the special verdict would have been different with Ganz's or Mandel's testimony, his motion must be denied.

The Court also rejects petitioner's contention that the government violated *Brady* for failure to disclose that Ganz disagreed with the government's theory of the case, and that Mandel "most likely told the Government that he was involved in the $8.5 million transfer to RRC." Pet. at 51. First, Pri-har's attack on the government fails because he knew the identities of both Ganz and Mandel well in advance of trial. As the Court has repeatedly noted, *Brady* does not require the government to disclose the source of exculpatory evidence when such information is in the hands of the defendant. Here, there is little doubt that petitioner knew Ganz, his accountant, and Mandel, a business associate, and the fact that they would purportedly give exculpatory testimony, in advance of trial. The government was under no obligation to disclose to petitioner what he already knew.

Finally, petitioner's argument that the government made a deliberate misrepresentation with respect to Ganz by commenting in rebuttal summation that Ganz would have supported the government's theory of the case is also without merit. A review of the government's summation reveals that the government commented in a general way regarding its failure to call Ganz and several other witnesses, and did so only in response to petitioner's counsel's summation that questioned their absence. The Court rejects petitioner's attempt to inflate these comments into the realm of a deliberate misrepresentation on the part of the government requiring a new trial. Ac-

cordingly, for all of the reasons stated, petitioner's motion for a new trial with respect to the financial statement counts is denied.

*The Bank of Tokyo Counts*

Pri-har next asserts that the government wrongfully withheld *Brady* material with respect to the Bank of Tokyo fraud counts by failing to disclose information about Lawrence Kneip, a former loan officer of the bank. *See* Pet. at 88–90. At trial, the government alleged that Pri-har, in an effort to obtain a loan from the Bank of Tokyo to refinance RRH's mortgage on an office building located in Poughkeepsie, New York, submitted false financial statements to the bank that overstated his net worth.[7] *See* Gov.Mem. at 28–29, 88–90. Again, Pri-har argues that the government violated *Brady* by failing to disclose that Kneip told the government before trial that he had engaged in "illegal activity with the bank." Pet. at 55. In support of this claim, Pri-har alleges that David C. Wolinsky, an attorney with the bank, told petitioner's current attorney, Walter Mack, that Kneip was involved in "illegal activity within the bank" and so notified the Government before trial. Lastly, Pri-har argues that had the government disclosed this information, his trial attorney could have used it, in conjunction with other newly-discovered evidence, to discredit Kneip's testimony regarding the bank's reliance on his financial statements. *See* Pet. at 55–56; Rep.Mem. at 40–41.

Pri-har's claim that the government violated *Brady* must fail with respect to Kneip because Pri-har bases his assertion that the government withheld impeachment evidence regarding Kneip on inadmissible double hearsay. Specifically, Pri-har relies on a internal memo from Mack that in turn recounts a conversation between Mack and Wolinsky in which Wolinsky told Mack that Kneip had engaged

---

7. For example, the government established at trial that Pri-har falsely claimed on his 1986 financial statement that he submitted to the Bank of Tokyo that he owned property in

Brooklyn valued at $1.5 million. In fact, the Brooklyn address provided by Pri-har was located in the middle of Greenwood Cemetery. *See* Gov. Mem at 88.

in some unspecified illegal activity, and that the BOT told the government this before trial. Quite aside from the fact the government presents a signed and sworn affidavit from Wolinsky wherein he states that he never told Mack that the BOT had informed the government that Kneip was involved in any illegal activity, *see* Gov. Mem. at Ex. 2, and even assuming that petitioner's reliance on the Mack memo is sufficient to raise a factual dispute, the Court must still deny his motion. Kneip told the government before trial that he had entered into a business venture with Pri-har from which he quickly withdrew. *See id.* at Ex 3. Although this disclosure could arguably constitute impeachment material, the government correctly notes that it was under no obligation to disclose this information to petitioner because he was well aware of his dealings with Kneip before trial. Therefore, petitioner's request for a new trial regarding the BOT counts is denied.

### The Dresdner Bank Counts

With respect to the Dresdner Bank fraud counts, petitioner seeks relief based on the government's conduct in "eliciting testimony which it knew or should have known to be inaccurate, if not untruthful." Rep.Mem. at 40; Pet. at 56–59. In the indictment, the government charged that Pri-har ordered RRC employees to manufacture fictitious invoices to falsely reflect sales of wheat so that Pri-har could regain control over the Israeli Wheat program. *See* Pet. at 56; Rep.Mem. at 39. Pri-har now claims that the government elicited false testimony from Isaac Fattal that RRC had sold no wheat from late 1992 through early 1993 even though the government had full knowledge that RRC had in fact sold wheat during this time period. Pri-har also contends that the government compounded the prejudicial effects of their misleading conduct by commenting on this inaccurate testimony in its summation. *See* Pet. at 56.

Pri-har's position is without merit because it mischaracterizes the government's position at trial. To the contrary, the government argued at trial that RRC had not sold any wheat at the *price* contained in the false invoices that Pri-har directed his employees to manufacture, and which were forwarded to Dresdner Bank. *See* Gov.Mem. at 91–92. The government never contended that RRC had not sold *any* wheat during the time period in question. In fact, language quoted by the petitioner in his petition corroborates the government's argument that its position at trial was that petitioner made false statements and submitted fictitious documents related to the *price* of wheat sales in late 1992:

> "There is no question here that everybody who was on the phone conversation, especially the defendant, knew that there was no real contract for sale of the wheat at $240.00 or anywhere close to that." Pet. at 58 (quoting the government's summation).

 Finally, the Court also notes that petitioner raised the identical arguments on direct appeal, and therefore the Court is without authority to review them again.

### B. The Overwhelming Evidence of Petitioner's Guilt

In any event, even if the Court were to conclude that petitioner has raised a colorable question regarding the existence of new evidence or of the government's failure to adhere to its disclosure obligations (which petitioner has not), the Court must conclude, given the overwhelming evidence of petitioner's guilt, that the outcome of his trial would not have been different.

With respect to the so-called "wheat fraud" counts, the government presented several witness that testified that Pri-har submitted false financial statements that overstated RRC's worth and that he overstated the purchase price of the wheat to the lending banks. *See* Gov.Mem. at 14–17. In addition to the testimony of numerous witnesses, the government presented several tapes (made by petitioner) that

contained detailed discussions between Pri-har and Fattal over the scheme to defraud the banks. For example, in one taped conversation Pri-har can be heard telling Fattal that the defrauded banks had no proof that RRC was paying the wheat farmers one price and that the banks were financing another. *See id.* at 51–52. On another such tape, Pri-har answers, in response to Fattal's concerns that the banks were becoming wise to their scheme, that they were already "guilty" of defrauding the banks. *Id.* These tapes, and other documentary evidence, established that Pri-har had intentionally misled the banks into believing that they were only financing the purchase prices of the wheat. *Id.* at 51–53; 57–58.

Likewise, the government presented strong evidence of Pri-har's guilt, in the form of testimony from several witnesses and taped conversations, that conclusively established his guilt with respect to the "steel" frauds. *See* Gov.Mem. at 23–27. As discussed above, the government proved that Pri-har fraudulently obtained two loans by pledging as collateral certain quantities of steel that he knew he did not control. *See id.* at 70–71. In one recorded conversation, Pri-har stated: "I'm repeating what I had told you a month ago, and two months ago, OK. If you're going to, to, look for the [steel] billets, you will not find the billets. The billets are gone. I'm telling you, half the quantity will not be there. I don't know where it is." Gov. Mem. at 73. In another, Pri-har admits that he no longer controlled the steel and that he did not know how he lost it. *See id.* Thus, even if the Court could credit petitioner's claims of new evidence regarding the "steel" fraud, such evidence would not have changed the result of the trial.

Similarly, as to petitioner's remaining contentions of newly-discovered evidence and prosecutorial misconduct, the Court must conclude that they would not have changed the outcome of the trial. The government proved through the testimony of witnesses, documents and tape-recorded conversations that Pri-har knowingly defrauded BNP–New York by submitting false financial statements and misrepresenting how certain credit lines would be used, *see* Gov.Mem. at 20–23, 82–84, that he submitted false and fictitious statement to various banks to obtain loans to fund certain commodities transactions, *see id.* at 11–14, 84–88, that he created false personal financial statements to finance one of his corporation's short-terms financial needs. *See id.* at 28–29, 88–90, and that he submitted fictitious invoices in connection with a loan application. *See id.* at 90–92. Accordingly, assuming arguendo that any of petitioner's claims survive, such claims must be denied because of the overwhelming evidence of his guilt.

C. *The Absence of "Prejudicial Spillover"*

Petitioner challenges his conviction for providing false statements to Citibank in order to obtain a $1 million loan and for submitting false documents to the USDA in order to obtain subsidies for which he was not entitled on the theory that the errors committed in obtaining convictions on the other fraud counts created a "prejudicial spillover" that made it impossible for the jury to fairly evaluate the evidence with respect to the Citibank and USDA counts. *See* Pet. at 60–62; Rep.Mem. at 41–47. The gravamen of petitioner's complaint is that the government's presentation of the entire case created a continuity between the various frauds allegedly committed by petitioner. *See* Rep.Mem. at 42–47. This rendered the jury unable to properly and neutrally evaluate the government's case against Pri-har with respect to the Citibank and USDA frauds. *See id.*

In evaluating a claim of taint or prejudicial spillover from dismissed or vacated counts, courts in this Circuit look to a variety of factors in determining whether "the totality of the circumstances requires reversal on some or all of the remaining counts." *United States v. Roo-*

*ney,* 37 F.3d 847, 855 (2d Cir.1994). Some of the factors include: (1) whether the evidence from the vacated counts would have incited or aroused the jury to convict the defendant on the remaining counts; (2) the similarity of the vacated and remaining counts, and whether the evidence of which would have been admissible to both; (3) the degree of dissimilarity between the evidence as to the vacated and remaining counts, permitting the inference that the jury was able to separate the evidence as to each count; and (4) whether the strength of the evidence presented by the prosecution on the remaining counts could withstand the potential prejudicial spill-over. *See United States v. Gore,* 154 F.3d 34, 48–49 (2d Cir.1998).

In the instant case, the Court must conclude, for the reasons set forth above, that there was no prejudicial spillover regarding the Citibank and USDA fraud counts. Accordingly, the Court declines to vacate petitioner's conviction on these counts.

### D. *Petitioner's Ineffective Assistance of Counsel Claims Must Fail*

Petitioner claims that he is entitled to a new trial, or an evidentiary hearing, because his trial attorney was ineffective. Although petitioner challenged his trial counsel's effectiveness on direct appeal,[8] petitioner now claims that the new evidence uncovered after trial, including the expert reports regarding the wheat transactions, demonstrates that his trial counsel was ineffective. Particularly, petitioner asserts that his trial counsel failed to investigate whether commodities trading experts would have corroborated petitioner's version of wheat loan documents, *see* Supplemental Petition dated February 28, 1997 ("Sup.Pet.") at 3–4; Rep.Mem. at 36, although he admits that his trial counsel

"contacted a few experts." *See* Sup.Pet. at 4. In addition, petitioner asserts that a letter submitted by trial counsel in connection with the instant petition further demonstrates counsel's ineffectiveness because he did not deem petitioner's view of the wheat loan documents worthy of review. *See* Rep.Mem. at 38. Petitioner also charges that his trial counsel delivered an ineffective summation by failing to make a series of arguments that petitioner directed him to make to the jury. *See* Sup.Pet. at 6–17. Finally, petitioner alleges that his trial counsel failed to meet with an inquisitive juror after trial, and that counsel refused to provide the juror's name to petitioner when he asked for it. *See id.* at 18.

Generally, a § 2255 petition may not be used as a vehicle to relitigate those issues raised on direct appeal. *See Rias-cos–Prado v. United States,* 66 F.3d 30, 33 (2d Cir.1995). Accordingly, the Court is precluded from reviewing petitioner's claims for ineffective assistance of counsel to the extent that petitioner raised those claims in his motion for a new trial and on direct appeal to the Second Circuit. *See id.* Thus, the vast majority of petitioner's claims must be dismissed because they were raised by the petitioner in his motion for a new trial to this Court and directly to the Second Circuit on appeal.[9]

Likewise, a defendant that fails to raise a claim on direct appeal is ordinarily barred from subsequently litigating that claim in a § 2255 petition unless he can show cause for his procedural default and prejudice resulting therefrom. *See id.* at 34. The Second Circuit has created an exception to this general prohibition in the context of claims for ineffective assistance of counsel by permitting a defendant to raise such claims without a cause and prej-

---

8. The Second Circuit, in response to Pri-har's ineffectiveness claim on direct appeal, noted that "far from being ineffective, counsel conducted the defense competently notwithstanding the overwhelming evidence of Pri-har's guilt." Order dated January 3, 1995, *United*

*States v. Pri-Har,* 47 F.3d 1157, 1995 WL 54374, at *3.

9. Therefore, all of petitioner's claims regarding counsel's ineffective summation must be denied. *See* Sup.Pet. at 12–15.

udice showing where the defendant was represented by the same attorney at trial and on appeal. *See Billy–Eko v. United States,* 8 F.3d 111, 114 (2d Cir.1993). However, where, as here, "(1) the petitioner was represented by new appellate counsel at direct appeal, and (2) the claim is based solely on the record developed at trial," petitioner must demonstrate both cause and prejudice. *Id.*

■ Petitioner's argument that his counsel was ineffective for failing to consult commodities experts fails for several reasons. As previously discussed, petitioner could have raised his counsel's failure to call experts regarding the interpretation of the wheat loan documents on direct appeal, since the new expert reports were based upon an interpretation of the wheat loan documents that were available to petitioner at trial and on appeal. Indeed, Pri-har's counsel on direct appeal received all of his trial counsel's files regarding his inquiry into obtaining experts after Pri-har's conviction. *See* Gov.Mem. at Ex. 4. Yet, petitioner fails to provide any explanation for his failure to raise this issue on his motion for a new trial to this Court, or on appeal to the Second Circuit. Therefore, in the absence of cause or prejudice, this Court must deny petitioner's claim as it is untimely.

■ In any event, petitioner's claim must fail because petitioner's trial counsel did not fall "below an objective standard of reasonableness." Rather, the Court concludes that counsel's actions constituted sound tactical decisions. *See Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, it is undisputed that trial counsel considered the possibility of utilizing a commodities expert in connection charges leveled against petitioner, but chose not to call them at trial. It is precisely this kind of strategic decision that the courts generally

consider to be insufficient to establish a claim of ineffective assistance of counsel. Since trial counsel investigated the possibility of utilizing an expert (albeit on a different fraud count), and ultimately rejected the idea, such a decision cannot be denominated as unreasonable.[10] Finally, petitioner's claim must fail because given the overwhelming evidence presented by the government at trial with respect to the wheat fraud, as discussed above, the outcome of the trial would not have been different.

The same is true with the other claims of ineffectiveness that petitioner levels against his trial counsel. Petitioner asserts that: (1) counsel, by failing to call the Olges liquidator with respect to the Dresdner Bank counts, failed to effectively rebut the government's case; (2) counsel failed to call Neal Mandel to testify that he induced Pri-har into believing that he owned certain properties listed on financial statements used in connection with the BOT and Citibank frauds; and (3) counsel failed to meet with an conscientious juror after trial or provide him with the juror's name. The Court has reviewed these claims and finds them to be without merit. Counsel's decisions not to call certain witnesses represented strategic choices, and, given the strength of the government's case, would not have changed the outcome of the jury's verdict.

### E. *Certificate of Appealability*

A certificate of appealability should only be granted in those circumstances where petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Since petitioner has failed to make such a demonstration, no certificate of appealability shall issue.

### CONCLUSION

Having reviewed petitioner's motions, and decided that they are without merit,

---

**10.** The Court would be remiss if it failed to note that a commodities expert did take the stand on petitioner's behalf. As present counsel conceded at oral argument, Pri-har, him-

self an expert on commodities trading, chose to testify at trial regarding his interpretation of the wheat loan documents. The jury chose to reject his testimony. *See* Arg. Tr. at 39.

**408**

the petitioner's motions shall be and hereby are denied. The Clerk of Court is directed to close the above-captioned action.

It is **SO ORDERED**